UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CUAUHTEMOC RODRIGUEZ, | No.  2:  14-cv-0654 TLN KJN P |
| Petitioner, | |
| v. | FINDINGS & RECOMMENDATIONS |
| DAVID B. LONG, | |
| Respondent. | |

I.  Introduction

Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2011 conviction for first degree murder and personal discharge of a firearm.  Petitioner is serving a sentence of 50 years to life imprisonment.

Petitioner raises two claims:  1) denial of right to an impartial jury; and 2) jury instruction error.  After carefully considering the record, the undersigned recommends that the petition be denied.

II.  Standards for a Writ of Habeas Corpus

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), an application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A

1

1   federal writ is not available for alleged error in the interpretation or application of state law.  See

2   Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir.

3   2000).

4       Federal habeas corpus relief is not available for any claim decided on the merits in state

5   court proceedings unless the state court's adjudication of the claim:

6       (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law, as
7       determined by the Supreme Court of the United States; or

8       (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
9       State court proceeding.

10  28 U.S.C. § 2254(d).

11      Under section 2254(d)(1), a state court decision is "contrary to" clearly established United

12  States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in

13  Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a

14  decision of the  Supreme Court and nevertheless arrives at a different result.  Early v. Packer, 537

15  U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

16      Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court

17  may grant the writ if the state court identifies the correct governing legal principle from the

18  Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

19  case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

20  that court concludes in its independent judgment that the relevant state-court decision applied

21  clearly established federal law erroneously or incorrectly.  Rather, that application must also be

22  unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough

23  that a federal habeas court, in its independent review of the legal question, is left with a 'firm

24  conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state court's

25  determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

26  jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter,

27  131 S. Ct. 770, 786 (2011).

28  ////

1    The court looks to the last reasoned state court decision as the basis for the state court

2    judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision,

3    "and the state court has denied relief, it may be presumed that the state court adjudicated the

4    claim on the merits in the absence of any indication or state-law procedural principles to the

5    contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing

6    that "there is reason to think some other explanation for the state court's decision is more likely."

7    Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

8    "When a state court rejects a federal claim without expressly addressing that claim, a

9    federal habeas court must presume that the federal claim was adjudicated on the merits – but that

10   presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

11   1088, 1096 (Feb. 20, 2013).  "When the evidence leads very clearly to the conclusion that a

12   federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de

13   novo review of the claim.  Id., at 1097.

14   Where the state court reaches a decision on the merits but provides no reasoning to

15   support its conclusion, the federal court conducts an independent review of the record.

16   "Independent review of the record is not de novo review of the constitutional issue, but rather, the

17   only method by which we can determine whether a silent state court decision is objectively

18   unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

19   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

20   basis for the state court to deny relief."  Harrington, 131 S. Ct. at 784.  "[A] habeas court must

21   determine what arguments or theories supported or, . . . could have supported, the state court's

22   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

23   arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at

24   786.

25   III.  Factual Background

26   The opinion of the California Court of Appeal contains a factual summary.  After

27   independently reviewing the record, the undersigned finds this summary to be accurate and

28   adopts it herein.

3

An information charged defendant and his sons, Agustin and Octavio, with the murder of victim Kevin Marshall. The information further alleged that defendant personally discharged a firearm and thereby caused the victim's death.  [Footnote omitted.]

On the afternoon of August 21, 2008, the 17–year–old victim and his 13–year–old friend G.W. were standing outside the building where G.W. lived. From outside an apartment complex across the street, defendant's teenage son Octavio, aka Tommy, was looking at them with "a mug," an "ugly look." The victim asked Octavio what he was looking at, and a fistfight ensued. Defendant and another son, Agustin, emerged from the building and joined the fistfight. Agustin ended up on the ground with a dislocated finger and thumb, multiple abrasions, and a laceration to the head. The victim also fought with defendant, who lost his balance and fell down during the encounter. This ended the fight.

The victim ran toward his home and saw his friend and neighbor, 18–year–old Lutrell Thomas. The victim said he had been "jumped" by several men. The victim and Thomas called for the victim's two brothers and two more friends to join them in returning to continue the fight. The victim and Thomas ran ahead, while the others walked behind them.

Meanwhile, in the victim's absence, defendant and his sons got into defendant's black Ford Mustang and moved it into the driveway of the apartment complex. According to G.W., they got out of the car when the victim and Thomas returned.

According to Thomas, he and the victim ran up to the car and they each assumed a boxing stance. Defendant pulled a gun from his waistband. The victim and Thomas turned and ran away. Defendant ran after them and fired several shots. No bullets hit Thomas. The victim was hit, but he made it back to the apartment complex, where he collapsed and died.

A neighbor testified he heard gunshots, looked out the window of his top floor apartment, saw a Black man running down the street, and several seconds later, saw the shooter following. The shooter fired three more shots and then ran back the way he had come. Another witness told a police officer that the man firing the gun did not run but just stood in the middle of the street as he fired the gun. Police discovered a bullet hole in a green van parked on the street and seven bullet casings in the street.

Thirteen-year-old Wendy N., a neighbor who lived in the same apartment building as defendant's family, was outside, passing out flyers for an organic vegetable stand. She knew Agustin from the apartment swimming pool, and her friend had dated Octavio. She knew the victim because she once lived in the building where he lived. She saw the fistfight and saw the victim run away. Defendant and his sons moved the car. The victim and Thomas returned, and the two groups yelled and cursed at each other. The victim assumed a fighting stance with his hands up. According to Wendy and another young witness, it was Agustin who pulled out the gun and

fired it.

After the shooting, the police tracked defendant and his sons to his sister's residence in Los Angeles. Agustin was arrested at a Los Angeles hospital. A search of the sister's home revealed a loaded .38–caliber handgun and ammunition, which the parties stipulated at trial was the gun that fired the bullet that killed the victim. When defendant was arrested, he told police, "You don't need my sons. They didn't do anything. I shot and killed that guy." He said nothing about shooting in self-defense.

A forensic pathologist testified that the victim sustained gunshot wounds from two bullets to the back. The pathologist opined that the shooter was behind the victim when the shots were fired. One bullet—which was not lethal—entered the back of the victim's right shoulder and exited the front of his body. The cause of death was a bullet that entered the back of the victim's right arm, exited and then entered the right side of the victim's back. A fragment of the lethal bullet was recovered from the victim's lung. The doctor placed a trajectory rod through the wounds in the back and arm, as depicted in a photograph admitted as People's Exhibit 35, which placed the victim's body in a position consistent with running. The lethal bullet passed through the lung, heart and pulmonary trunk, and stopped in the left lung.

Defendant testified in his own defense. On the day of the shooting, he was inside his apartment when his daughter ran in and said some guys wanted to fight Octavio outside. Defendant and Agustin went outside, where the victim and his friend were standing. Octavio told defendant, "Those black kids want to fight with me." Defendant asked the victim, "What's up?" and "Do you have any problems with my sons?" The victim pointed to Octavio and said to him, "What's up, nigger?" Agustin then said, "[d]o you have a problem with my brother?" and the victim said, "[w]ith you too." The victim and Agustin began to fight. Agustin grabbed the victim around the neck, and the victim grabbed Agustin around the stomach. Both fell to the ground. Agustin could not get up. Defendant approached to help him up. The victim tried to hit defendant. Defendant stepped on his own untied shoelaces and fell down. The victim hit defendant. Defendant did not hit the victim. Defendant put his hands up and said, "Oh, you want to fight with me now? Are you sure you want to fight with me?" The victim backed up. Defendant said, "All right, boy, you win." "Go home." The victim asked, "Can I get my bike?"; it was leaning against the fence. Defendant said yes. The victim then left the area.

According to defendant, he got in his car to take Agustin to the hospital and sent Octavio upstairs to get Agustin's medical card. The victim and Thomas returned, running toward the car. Each was reaching behind his back. Defendant testified that Agustin told him the victim and his friend were going to "shoot us up." [Footnote 3.)

> [Footnote 3:   On both direct and cross-examination, defendant testified that Agustin told him the people running toward them were going to "shoot us up." In her opening

brief, appellate counsel wrote that the men who were running toward the Mustang said they were going to "'shoot up' [defendant] and his sons." As will be seen, this is one of several misrepresentations of the record made by appellate counsel.]

Defendant was afraid. He lived in a dangerous neighborhood where shootings had occurred. Defendant retrieved his gun from under the driver's seat. He kept it there instead of the house because Agustin was on probation, which prohibited him from having a gun "near him." Defendant testified that, although the police had not found the gun when they searched defendant's car in an unrelated incident several months before the shooting, the gun was there, and the police overlooked it.

The victim and Thomas stopped approximately 30 feet away. Defendant put the gun in his waistband and got out of the car, intending to bring calm to the situation. According to defendant, Thomas said, "You want to fight with my brother?" and used the word "[m]otherfucker." Defendant said, "Hey, boys, no more trouble." Thomas replied, "You are fighting with my brother, motherfucker." Thomas, who had approached to a point about 13 feet from defendant, put his hand behind his back. Defendant believed Thomas was going for a gun and feared for his life and the lives of his sons, so defendant pulled out his gun, pulled the slide back and aimed it. Thomas saw the gun and ran away. According to defendant, the victim, who was at that time about 22 feet away, put his hand behind his back. Defendant believed the victim was reaching for a gun. Defendant fired six or seven shots at the victim, who ran away after all of the shots had been fired. Defendant testified that the victim was facing him when all of the shots were fired. He denied shooting at the victim while the victim was running away. Defendant said he did not know the victim had been hit. Defendant said he got back in his car and drove off with Agustin. Defendant traded cars with his wife, and then drove Agustin and Octavio to Los Angeles. Defendant was afraid that if he went to a local hospital, he and Agustin would be arrested and Agustin would not get the medical care he needed. Defendant also feared deportation.

Defendant admitted he had no explanation for the bullet trajectory which indicated the victim had been shot in the back.

The jury found defendant guilty of first degree murder and found true the gun allegation.

On February 8, 2011, the trial court sentenced defendant to an indeterminate term of 25 years to life on the murder count, plus a consecutive term of 25 years to life for personal discharge of a firearm causing death.

People v. Rodriguez, 2012 WL 5383095 at *1-3 (2012).

////

6

IV.  Claim 1:  Alleged Juror Bias

     A.  Opinion of California Court of Appeal

       The California Court of Appeal was the last state court to issue a reasoned opinion addressing this claim.  Accordingly, the undersigned gives AEDPA deference to this opinion.

       The California Court of Appeal denied petitioner's juror bias claim for the reasons stated herein:

       DISCUSSION

       I. Autopsy Photographs

       Defendant contends the trial court committed reversible error by refusing to dismiss a juror who became ill after seeing the autopsy photographs during trial and could not view this evidence. We disagree.

       A. Background

       Before trial, the prosecution moved in limine to use autopsy photographs to show the trajectory of the bullets that struck the victim. The trial court ruled some of the photographs could be admitted, but precluded others. Using the autopsy photographs, the forensic pathologist described how the two bullets hit the victim, and stated that one of them—the lethal bullet—entered the back of the victim's right forearm, exited that arm, and reentered when it perforated the right side of the victim's back. The pathologist opined that the victim was shot in the back, whereas defendant testified the victim was facing him and reaching for a gun when defendant shot at him.

       One of the photographs allowed at trial showed a metal rod passing through the wounds in the victim's arm and into his back. When the prosecutor moved on to an X-ray exhibit, the trial court called a recess and asked Juror No. 6 to stay behind. The following ensued:

       THE COURT: How are you doing?

       SWORN JUROR NO. 6: I just get really queasy. I'm sorry.

       THE COURT: All right. I think we're probably about finished with the pictures, are we not, at least from the District Attorney?

       [PROSECUTOR]: We have no more pictures of the body.

       THE COURT: [Defense] Counsel, are you going to be putting the pictures back up?

       "[AGUSTIN'S COUNSEL]: No.

[DEFENDANT'S COUNSEL]: No. But, Your Honor, the photographs may be examined in the jury deliberations room.

THE COURT: Well, that's true. What we need to make sure is that you can take a look at those photographs not just for the sake of looking at them and seeing the blood, but to determine—One of the things that the lawyers are going to be arguing about is that trajectory. [¶] So will you be able to take a look at those photographs, discuss them with the other jurors and look at them with that in mind?

SWORN JUROR NO. 6: I'll try.

THE COURT: Okay. If you cannot, you make sure and let us know.

SWORN JUROR NO. 6: Okay. Is that going to be a problem if I can't?

THE COURT: If you can't, then we will have alternates. We can put alternates in.

SWORN JUROR NO. 6: Okay.

THE COURT: And you have been chosen as a juror.

SWORN JUROR NO. 6: I know.

THE COURT: We would just as soon you do it, but if there is something that makes you not able to fully consider and discuss the evidence, then don't you hesitate to tell us.

SWORN JUROR NO. 6: Okay.

THE COURT: And we will let you out, and you can stay and watch the rest of the trial if you would like, but we will put an alternate in to deliberate. Okay?

SWORN JUROR NO. 6: I just don't want to get sick in front of everybody, you know.

THE COURT: Pardon?

SWORN JUROR NO. 6: I just don't want to get sick or pass out.

THE COURT: All right. And, also, if you feel yourself getting sick or if you have any problem at all, if you got up and walked out, I would know why, and we can take a break. Okay?

SWORN JUROR NO. 6: Okay.

THE COURT: If you can, tell the bailiff first, but if you need to, just get up and walk out. Do you want a bucket?

SWORN JUROR NO. 6: No, I'm okay.

1    THE COURT: All right. We will start back up at 2:30.

2    (Sworn Juror No. 6 leaves the courtroom.)

3    THE COURT: Anything for the record, Counsel?

4    [PROSECUTOR]: No.

5    [AGUSTIN'S COUNSEL]: Your Honor, if I may. On behalf of
     Agustin Rodriguez, I'm going to ask the other parties to enter into a
6    stipulation to relieve Juror No. 6.[¶] My observation of her was, I
     saw her on the—when the very first picture was published. Because
7    I remember voir dire and I checked her out real quick, and I
     honestly thought she was going to come close to regurgitation, like
8    she was going to throw up. I think her responses have dropped
     down to [sic ] 'I can be fair and impartial' to 'I'll try.'
9
     [DEFENDANT'S COUNSEL]: Your Honor, just for the record, I
10   would join in [Agustin's counsel's] position.

11   THE COURT: [Prosecutor].

12   [PROSECUTOR]: I'm not prepared to actually enter into the
     stipulation to remove her at this point. I think what Juror No. 6 is
13   doing is, she's having a difficult time because they are not pretty
     pictures. She told us that. She still indicated that she is going to do
14   her best to be fair, just like she promised us before. She understands
     that if she cannot look at these photographs and discuss these
15   photographs, she is to alert the Court, and we can make the
     appropriate adjustments at that point. [¶] I'm not hearing—I just
16   don't hear enough for me to enter—be willing to enter into a
     stipulation to relieve her at this point, Your Honor. Perhaps I can—
17   I'll focus on her a little bit more as the afternoon progresses, but—

18   THE COURT: I haven't heard a motion for cause. Is there a motion
     or—All I have heard is your invitation to the stipulation.
19
     [DEFENDANT'S COUNSEL]: Well, I would make the motion for
20   cause, Your Honor.

21   THE COURT: Is this matter submitted?

22   [PROSECUTOR]: I'll submit.

23   [AGUSTIN'S COUNSEL]: Your Honor, just one other real quick
     thing, if I could.
24
     THE COURT: Sure.
25
     [AGUSTIN'S COUNSEL]: I would rather—and maybe this is not
26   expediency, but I think it's reasonable. I think I would rather—I
     will join the motion for cause now, and I would rather let her go
27   now than let her get two days into deliberation, then come and tell
     you that she can't play any more or she can't be fair and impartial
28   because of her sensitivities. If we put in an alternate, we start the

9

deliberation all over again. [¶] So now I submit.

THE COURT: I understand that it would be a matter for expedience; however, you guys picked these jurors, and I anticipate you did that purposefully, so unless there is actual cause, I would not remove her absent a stipulation. [¶] I'm satisfied that she will, as she did, notify the bailiff if she is not feeling well and notify the Court if she can't continue. So unless I see something to contradict that impression, I will leave her on and trust that she will let us know. And you guys keep an eye on her, as well."

Questioning concerning the autopsy resumed in front of the jury but was soon interrupted by the following:

THE COURT: ... [¶] Juror No. 6, it doesn't look to me like you are doing so good.

SWORN JUROR NO. 6: Do I look bad?

THE COURT: No. You just don't—You look like you can't look at that.

SWORN JUROR NO. 6: I'm sorry.

THE COURT: Are you able to?

SWORN JUROR NO. 6: Yes.

THE COURT: Okay. I'm just checking.

At the end of the day, after the jurors left the courtroom, the following occurred:

THE COURT: All right. We are out of the presence of the jury. Briefly for the record, when I broke in and inquired of Juror No. 6, it was because I noticed she was looking around and not looking up at the photograph on the screen. Later on when we were talking about—when the other witnesses were on and not talking about any of the autopsy or anything like that, I noticed that she had the same kind of detached demeanor, that she was often looking down and periodically looks up at the witness or looks around. But, in general, she seems to have a fairly detached presentation. [¶] Anything else for the record?

[PROSECUTOR]: No.

[AGUSTIN'S COUNSEL]: I would agree with the Court in their [sic] observations. My concern was that she was refusing to look at the evidence, but then I watched her when Detective Jasperson took the stand, and she was staring at the same place in [sic] the floor, so—

[DEFENDANT'S COUNSEL]: She wasn't looking at the photograph when I put it back up on the projector.

[AGUSTIN'S COUNSEL]: It did not appear so to me.

THE COURT: She is also apparently very concerned with—I don't know—split ends or something having to do with her hair. [¶] All right. Anything else for the record?

[PROSECUTOR]: No, not on the record, Your Honor.

Defendants did not renew their earlier motion to excuse the juror for cause or contend that inattention was an additional reason to excuse the juror.

B. Analysis

Section 1089 provides, in pertinent part, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." (§ 1089, 5th par.)

A trial court has "broad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve." (People v. Millwee (1998) 18 Cal.4th 96, 142, fn. 19.) We review the trial court's determination for abuse of discretion. (People v. Boyette (2002) 29 Cal.4th 381, 462 (Boyette); People v. Cissna (2010) 182 Cal.App.4th 1105, 1117.)

When a juror's fitness is questioned, the trial court must make a reasonable inquiry to determine whether the juror should be discharged. (People v. Bradford (1997) 15 Cal.4th 1229, 1348–1349.) "'[T]he mere suggestion of juror "inattention" does not require a formal hearing disrupting the trial of a case. [Citation.]'" (Bradford, supra, at p. 1348; see id. at pp. 1348–1349 [trial court did not abuse its discretion in declining to conduct a hearing where juror fell asleep twice but did not appear to continually fall asleep or sleep for a long period of time].) Although juror inattentiveness may constitute misconduct, "'courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial.... Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, [the] cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial.'" (Id. at p. 1349.)

The inability of the juror to perform his or her duties must be shown in the record to a "'"demonstrable reality"'" (People v. Jablonski (2006) 37 Cal.4th 774, 807), and we review the trial court's exercise of discretion in this context under that standard (People v. Fuiava (2012) 53 Cal.4th 622, 711 (Fuiava)). We do not reweigh the evidence. (Fuiava, supra, at p. 714.) And we give

11

deference to the trial court's firsthand observations unavailable to us on appeal. (People v. Barnwell (2007) 41 Cal.4th 1038, 1053.) "Demonstrable reality" is a more stringent standard than "substantial evidence." (Id. at p. 1052.) To meet the demonstrable reality standard, the trial court's decision to remove a juror must be "manifestly supported" by the evidence on which the court actually relied. (Id. at p. 1053.) Under that standard, the trial court is not permitted to presume the worst of a juror. (People v. Compton (1971) 6 Cal.3d 55, 59–60; People v. Bowers (2001) 87 Cal.App.4th 722, 729.)

Here, defendant argues the record makes clear that Juror No. 6 was not able to look at the autopsy pictures. Defendant's appellate counsel goes further and falsely claims in the opening brief that the juror "consciously refused to consider key evidence." Defendant also says the juror was detached during the remainder of the trial, which defendant suggests shows her inability to impartially confront the evidence, whether from her aversion to the autopsy photos or some "deeper mental deficiency."

However, there is no evidence whatsoever of mental deficiency. Nor does the record support the misrepresentation of defendant's appellate counsel that the juror consciously refused to consider the evidence. The juror did look at the photographs during trial, which is why she felt queasy. That the trial court observed her not looking at a photograph the second time it was displayed does not demonstrate an inability to confront the evidence. The court checked in with her, and she affirmatively stated she was able to look at the photograph. She also affirmatively stated she would inform the court if she could not look at and discuss the evidence during deliberations. The fact that she did not alert the court of any problem during deliberations indicates she was able to look at and discuss the evidence.

Defendant also argues on appeal that the juror was "detached" as the trial continued, and should have been excused for this reason. Assuming, arguendo, that this contention was not forfeited when defendant's counsel did not assert it at trial (see Boyette, supra, 29 Cal.4th at p. 462), we address the merits.

Defendant cites cases holding that trial courts did not abuse their discretion in excusing jurors for a variety of personal issues. None of these cases make the trial court's decision in this case an abuse of discretion. In People v. Marshall (1996) 13 Cal.4th 799, a juror got a speeding ticket which could cost him his job. The juror considered it unjust that the district attorney's office would not drop the matter. (Id. at pp. 845–846.) Even though the juror said it would not affect his performance on the jury, the trial court concluded there was no way the juror could avoid it affecting his judgment at least unconsciously. (Ibid.)

In People v. Fudge (1994) 7 Cal.4th 1075, when the jury began deliberations, a juror asked to be discharged because she was starting a new job soon. (Id. at p. 1098.) She initially said her anxiety over the new job would not affect her deliberations, and the

court left her on the jury. After the jury returned verdicts on some counts and returned to deliberate on the remaining counts, the same juror again asked to be discharged but again said her anxiety would not affect her deliberations. However, after phoning her present employer, the juror told the court that the manager said she needed to do paperwork so the employer could vacate her spot, and the juror affirmatively stated her anxiety over this matter would affect her jury deliberations. (Id. at p. 1099.) The trial court excused her at that point. The Supreme Court affirmed, holding (1) the record supported the trial court's ruling that good cause to excuse the juror did not exist before she spoke with her employer, and (2) good cause to excuse her did exist after she spoke with her employer. (Id. at pp. 1099–1100.) Fudge supports affirmance in our case, where the juror earlier expressed anxiety but said it would not affect the performance of her duties as juror.

Defendant also cites Mitchell v. Superior Court (1984) 155 Cal.App.3d 624, which held double jeopardy did not bar a retrial after the first trial ended in a mistrial when the court excused a juror who said he had prejudged the case and his mind kept wandering and he could not concentrate. (Id. at pp. 626–629.) The appellate court disregarded the juror's expression of prejudice, but concluded the juror's inability to concentrate was good cause to excuse the juror. (Id. at p. 629.) Here, in contrast, the juror said she was able to perform her duties as juror, and would let the court know if she could not.

Defendant also cites People v. Green (1971) 15 Cal.App.3d 524, which held a juror's moving out of state was good cause for the trial court to excuse her from the sanity and penalty phases of trial. (Id. at pp. 528–529.)

That the trial courts in the foregoing cases did not abuse their discretion in excusing jurors does not mean the trial court here abused its discretion in keeping Juror No. 6.

Defendant argues this case is analogous to People v. Ramirez (2006) 39 Cal.4th 398, 456–457, which held a trial court properly dismissed a juror after observing the juror sleeping multiple times during trial and learning that other jurors also observed the juror dozing during trial and deliberations. The Supreme Court held the trial court does not abuse its discretion when it discharges a juror who falls asleep during trial. (Id. at pp. 457–458.) Defendant argues the same inability to concentrate is present in this case. But it is not. Falling asleep is not the same as feeling queasy when viewing autopsy photographs or twirling one's hair. Moreover, Ramirez does not stand for the principle that a juror who appears inattentive must be dismissed. Rather, Ramirez held it was not an abuse of discretion for the trial court to dismiss the juror under the circumstances of that case. Here too, it was not an abuse of discretion for the trial court to keep Juror No. 6.

In People v. Bennett (2009) 45 Cal.4th 577, a juror expressed concern that the extension of the trial beyond the date it was originally predicted to conclude created a problem with her job as

13

office manager of an elementary school. (Id. at pp. 618–621.) When the court asked if she would be distracted wondering what was going on at the school, she said, "Of course I'll be wondering what's happening at school," but she felt strongly that she could continue on the jury and maintain her focus on the case. (Id. at p. 620.) The Supreme Court concluded there was no abuse of discretion in declining to excuse the juror. The trial court was in the position to observe the juror's demeanor in answering the court's questions and was persuaded the juror could perform her duties. (Id. at p. 621.)

Here, the record does not show as a demonstrable reality that Juror No. 6 could not carry out her responsibility to consider all of the evidence or that she was inattentive to the point that she missed trial evidence. Rather, it shows the trial court was hypervigilant after the juror's initial reaction to the autopsy photographs, such that the court noticed the juror played with her hair, looked around the room, and did not take a second look at an autopsy photograph redisplayed by defense counsel after having looked at the photograph when it was first displayed by the prosecution. None of this makes the trial court's decision an abuse of discretion. The trial court was in the position to observe the juror's demeanor in answering the court's questions and was persuaded the juror could perform her duties. (People v. Schmeck (2005) 37 Cal.4th 240, 298, abrogated on other grounds in People v. McKinnon (2011) 52 Cal.4th 610, 637.)

Since we conclude the trial court did not abuse its discretion in keeping Juror No. 6 on the jury, we need not address defendant's argument that he was prejudiced by the trial court's error. We nonetheless address that argument as it relates to the autopsy photograph. Defendant assumes Juror No. 6 committed misconduct by not considering the autopsy photograph, thus raising the rebuttable presumption of prejudice discussed in In re Hamilton (1999) 20 Cal.4th 273, 295–296 (Hamilton). Assuming the presumption of prejudice arises in this context, that presumption is rebutted by the evidence and the arguments of counsel.

Defendant contends his testimony that the victim was facing him when he began firing made the autopsy photographs "a critical piece of evidence," and "[t]he difference between murder and voluntary manslaughter hung on this evidence." Yet, the autopsy photographs, combined with the pathologist's testimony, established that the victim's back was to defendant when the victim was struck by two of the bullets defendant fired. And defendant's attorney wisely conceded, based on the pathologist's testimony and photograph showing the bullet trajectories, that the victim was not facing defendant when defendant shot at him. Defense counsel argued defendant believed the victim was facing him, but was wrong in that belief.  [Footnote 4.]

> [Footnote 4:    Defendant's counsel told the jury: "[Defendant] also tells us that [the victim] was facing him when he fired all seven of these shots. Now, we know that that can't be the case because we had the testimony from Dr. Fiore, ... a forensic pathologist, who conducted the autopsy

examination on the body of [the victim], and he told us that the wounds were back to front.... You will recall that she told us, that in her opinion—there was a photograph ... with a directional rod ... where they positioned the arms so it would have been as though he were running. They put a rod through a wound to the arm into the wound of the upper back torso to show that that could have been a single shot that struck [the victim] as he was running. It went through his arm and then into his chest through his lungs, his heart and caused his rather immediate death. *So he could not have been facing [defendant ] when all these shots were fired.* [¶] But, Ladies and Gentlemen, if you look at this record again, if you go back and recall the evidence, there is some support here for [defendant's] belief that [the victim] was facing him when the shots were fired. *He was wrong in that belief. That's what the physical evidence tells us.* But I think the question here is: Could he have believed that, given the circumstances of the situation in which he was operating at the time these shots were fired? And again, this is happening quickly. It's under stress. And you have to assess it from that standpoint...." (Italics added.)

In our view, defendant essentially asserts on appeal that Juror No. 6 failed to consider evidence that was helpful to the prosecution, not evidence that was helpful to his case. Thus, assuming, arguendo, Juror No. 6 did not consider the evidence, defendant was not prejudiced, even applying the juror misconduct standard of "no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant." (Hamilton, supra, 20 Cal.4th at p. 296; see People v. Danks (2004) 32 Cal.4th 269, 303, quoting In re Carpenter (1995) 9 Cal.4th 634, 654 ["'All pertinent portions of the entire record, including the trial record, must be considered. "The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record*, that there is no substantial likelihood that the complaining party suffered actual"' ' bias."] (Italics added by Carpenter.)

Here, assuming Juror No. 6 did not consider the autopsy photograph, no prejudice occurred because if she had considered it, the verdict would have been the same.

People v. Rodriguez, 2012 WL 5383095 at *3-9.

B. Analysis

Petitioner argues that juror 6 should have been dismissed because she was unable to consider the autopsy photos. In support of this claim, petitioner attaches the briefing he submitted to the California Supreme Court in support of his petition for review. In this briefing, petitioner cites both state and federal law.

////

15

To the extent petitioner argues that the trial court abused its discretion under state law in failing to dismiss juror 6, such a contention is not cognizable in federal habeas.  Generally, issues of state law are not cognizable on federal habeas.  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  "The availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution."  Sawyer v. Smith, 497 U.S. 227, 239 (1990).  Accordingly, to the extent petitioner raises a state law claim regarding the trial court's failure to dismiss juror 6, it is not cognizable in this action.

State criminal defendants have a federal constitutional right to a fair and impartial jury.  Duncan v. Louisiana, 391 U.S. 145, 149 (1968).  A defendant's Sixth Amendment right to a fair trial is violated when the "essential feature" of the jury is not preserved.  Williams v. Florida, 399 U.S. 78, 100 (1970).  California Penal Code section 1089 governs the dismissal and substitution of jurors in California criminal trials.  Under section 1089, a juror may be removed from service either before or after final submission of the case if the juror becomes ill, dies, or upon other "good cause."  Id.  The Ninth Circuit has upheld the constitutionality of section 1089, after determining that it "preserved the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments."  Miller v. Stagner, 757 F.2d 988, 995 (9th Cir.), amended, 768 F.2d 1090 (9th Cir. 1985).  Accordingly, reviewing habeas courts need only decide whether the state court's application under the circumstances violated a petitioner's Sixth Amendment rights (e.g., whether good cause existed for the dismissal of the juror).  Perez v. Marshall, 119 F.3d 1422, 1426–28 (9th Cir.1997).

Section 1089 provides in pertinent part:

> If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall than take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.

Cal.Penal Code § 1089.

////

16

1    Under AEDPA, a state court's factual determination that good cause existed for the

2    dismissal of a particular juror is presumed correct, and must be upheld unless the finding was

3    based on an "unreasonable determination of the facts in light of the evidence presented in the

4    State court proceeding."  28 U.S.C. §§ 2254(d) (2), (e)(1); Perez, 119 F.3d at 1426.

5    The undersigned finds that the California Court of Appeal did not violate clearly

6    established federal law when it upheld the trial court's findings that there was no good cause to

7    dismiss juror 6, and that juror 6 was able to carry out her responsibilities as a juror.  The state

8    appellate court reasonably found that juror 6's failure to look at the photos the second time they

9    were displayed did not demonstrate an inability to confront the evidence.  The state appellate

10   court also reasonably found that the trial court correctly denied petitioner's request to excuse

11   juror 6 after juror 6 told the trial court that she would be able to look at the photos and that she

12   would inform the court if she could not look at and discuss the evidence during deliberations.

13   To the extent petitioner argues that the trial court should have dismissed juror 6 because

14   she was "detached," the undersigned finds that the California Court of Appeal reasonably denied

15   this claim as well.  The state appellate court reasonably found that the record did not show that

16   juror 6 was inattentive to the point that she missed trial evidence.  The state appellate court

17   reasonably found that the trial judge was vigilant after juror 6's initial reaction to the autopsy

18   photos and was persuaded that juror 6 could perform her duties after questioning her.

19   The undersigned also agrees with the California Court of Appeal that petitioner has not

20   demonstrated that he was prejudiced by the trial court's failure to remove juror 6, i.e., that the

21   failure to remove juror 6 had a "substantial and injurious effect or influence in determining the

22   jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).  As noted by the California

23   Court of Appeal, the purpose of the at-issue autopsy photos was to show the trajectory of the

24   bullets that petitioner shot at the victim.  The doctor who performed the autopsy testified that the

25   victim was shot twice.  (RT at 552.)  Based on the location of the shots in the victim's body, the

26   doctor testified that she could tell that the shooter was standing behind the victim.  (Id. at 563.)

27   Thus, even if juror 6 was unable to view the autopsy photos, she was able to hear the testimony of

28   the doctor regarding the trajectory of the shots and the location of the shooter.  In addition, as

17

1  noted by the California Court of Appeal, during closing argument petitioner's lawyer admitted

2  that the victim could not have been facing petitioner when he was shot.  (RT at 891-92.)

3          Because petitioner's counsel admitted that the victim was not facing petitioner when he

4  was shot, based on the doctor's undisputed testimony, the trial court's failure to dismiss juror 6

5  based on her alleged inability to view the autopsy photos did not have a substantial and injurious

6  impact on the verdict.  For these reasons, this claim should be denied.

7  V.  Claim 2:  Alleged Jury Instruction Error

8          A.  Opinion of California Court of Appeal

9          The California Court of Appeal was the last state court to issue a reasoned opinion

10 addressing this claim.  Accordingly, the undersigned gives AEDPA deference to this opinion.

11 The California Court of Appeal denied this claim for the reasons stated herein:

12          II. Jury Instruction

13          Defendant next argues the trial court erred by modifying
            CALCRIM No. 505—the jury instruction on justifiable homicide:
14          self-defense and defense of others—by adding that fear of great
            bodily injury could include injury inflicted by hands or fists.
15          Defendant argues the modification constituted judicial endorsement
            of the prosecution's theory of the case and lessened the burden of
16          proof. We disagree.

17          A. Background

18          The trial court added the following italicized language to the
            penultimate paragraph in CALCRIM No. 505: "Great bodily injury
19          means significant or substantial physical injury. It is an injury that
            is greater than minor or moderate harm, *and may be inflicted by
20          hands or fists*." (Italics added.)

21          The court also instructed the jury with CALJIC No. 5.31: "An
            assault with the fists does not justify the person being assaulted in
22          using a deadly weapon in self-defense or defense of another unless
            that person believes, and a reasonable person in the same or similar
23          circumstances would believe, that the assault is likely to inflict
            great bodily injury upon him or upon another person."
24
            B. Analysis
25
            Defendant's appellate counsel again misrepresents the record by
26          claiming the trial court added the "hands or fists" language "[o]ver
            appellant's objection." As the People point out, defendant's trial
27          counsel actually requested that language.

28 ////

Defendant's reply brief says trial counsel proposed multiple modifications to CALCRIM No. 505, some of which the trial court rejected, and defendant claims he did object to the trial court that he did not want the "hands and fists" language without his other modifications. Again, appellate counsel misrepresents the record.

After the court read the instructions to the jury, it asked counsel if there were any objections to the instructions. Defendant's trial counsel stated that he had several objections for the record. Regarding the modified CALCRIM No. 505, counsel stated, "I objected to the Court giving the version of CALCRIM 505 that is in the instruction package, and we requested in our trial brief a slightly different version of CALCRIM 505.... [¶] The Court did give one portion of that instruction that we requested. That was the—it's included in the Court's instructions, and that is that great bodily injury can be caused by hands and fists, but I wanted the Court to give the entire instruction ... that we had crafted, because I felt that it was a better statement of the law and the burden on the People to prove beyond a reasonable doubt that this was not an act of self-defense. So having said that, that's the basis for my objection." The trial court said, "We did make a little bit of a modification of 505 to add in that the great bodily injury may be inflicted by hands or fists. It appeared to me that adding in any more about the District Attorney's burden was redundant to the language that was already in the instruction." [Footnote 5.]

> [Footnote 5:  The trial court rejected defendant's proposed language that stated:  "Unless the prosecution proves beyond a reasonable doubt that [defendant's] beliefs were unreasonable, self-defense or defense of another applies regardless of whether or not the danger actually existed."]

It is clear that defendant's proposed modification included the very language about which he now complains. Indeed, defendant devoted some two and a half pages in his trial brief to argument supporting the addition of the "hands or fists" language. Defendant's trial brief does not state he wanted all his proposed modifications to CALCRIM No. 505 or none at all, and defendant did not object in the trial court on the grounds that he advances now on appeal. And defendant does not contend on appeal that the trial court erred in rejecting other parts of defendant's proposal. Since defendant requested of the trial court the exact language he now challenges on appeal, the invited error doctrine bars his appellate challenge. (People v. Huggins (2006) 38 Cal.4th 175, 250 (Huggins).)

Even if we entertain the contention, it lacks merit. The modified instruction accurately states that great bodily injury can be inflicted by hands or fists. Indeed, the instruction actually benefited defendant by allowing the jury to find he acted in self-defense, even if the victim and Thomas did not have any weapons other than their fists.

Defendant acknowledges the modification was a correct statement of law, i.e., that great bodily injury can include injury by hands or

fists. He argues that, since the ability to cause great bodily injury with fists is implied in the commonly understood definition of great bodily injury, there was no need to state it expressly. Defendant claims the trial court, by "emphasizing" that great bodily injury can include injury by hands or fists, led the jury to believe that the court regarded the fist fight as the sole provocation and therefore minimized defendant's claim that the victim appeared to be reaching for a gun. He argues the two instructions together endorsed the prosecution's theory that defendant shot the victim in response to a fistfight, and that this fistfight did not justify defendant's use of deadly force. Defendant says the instructions also lessened the prosecution's burden of negating the defense theory that the victim was reaching for a gun when defendant shot him.

Defendant cites no authority whatsoever supporting reversal here, where the modification correctly stated the law. He cites case law that the correctness of an individual jury instruction is evaluated in the context of the entire charge to the jury, not in isolation. (People v. Harrison (2005) 35 Cal.4th 208, 252.) True, but that is not helpful to defendant. Where, as here, a defendant claims that instructions correct in law are ambiguous or misleading, the proper standard is to determine whether there is a reasonable likelihood that the jury misunderstood the instructions in the manner asserted by the defendant. (Boyde v. California (1990) 494 U.S. 370, 380–381; Huggins, supra, 38 Cal.4th at p. 193.) In making that determination, we look to the instructions as a whole. (People v. Smithey (1999) 20 Cal.4th 936, 963 [" ' " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."] We also look to the arguments of counsel. (See People v. Garceau (1993) 6 Cal.4th 140, 189.)

Here, there is no likelihood that the instructions led the jurors to convict defendant because they believed the trial court regarded the fistfight as the sole provocation and therefore minimized defendant's claim that the victim appeared to be reaching for a gun. Consistent with CALCRIM No. 101, which was given at the beginning of the trial, the court expressly told the jury, "Do not take anything I say or do during trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." At the end of the trial, consistent with CALCRIM No. 3550, the trial court repeated the admonition it gave at the beginning of the trial, instructing the jury, "It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." Earlier in the charge at the end of the trial, consistent with CALCRIM No. 200, the trial court told the jury, "Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We presume the jurors followed the instructions. (Fuiava, supra, 53 Cal.4th at p. 716.)

Moreover, none of the evidence supported defendant's theory other than his own self-serving testimony. All other evidence pointed the

other way, e.g., no gun was found on the victim, and the victim was shot from behind as he was running away.

Lastly, nothing the prosecutor said during closing argument misled the jury. Contrary to defendant's argument on appeal, the prosecutor did acknowledge defendant's theory that the victim was reaching for a gun, and at no time did the prosecutor imply such evidence would not support a valid legal theory in this case. The prosecutor urged the jury to reject defendant's testimony. The prosecutor argued the testimony that defendant believed the victim and Thomas had guns was not reasonable, because if he really thought that, defendant would not have gotten out of his car to try to calm the situation down. She also argued it was unreasonable for the victim to reach for a gun he did not have. Additionally, the prosecutor emphasized that the victim was gunned down as he was fleeing, and contended it is not self-defense to shoot a person who is running away from you in the back even if you believe he had a gun. The prosecutor argued that, at most, such a scenario equates to a belief in future, not imminent harm.

We conclude defendant fails to show instructional error.

People v. Rodriguez, 2012 WL 5383095 at *9-11.

B. Procedural Default

Respondent argues that petitioner's claim challenging the modification to CALCRIM 505 is procedurally barred based on the California Court of Appeal's finding that petitioner waived the claim by requesting the at-issue change.[1]

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977). As a general rule, a federal habeas court "'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). The state rule is only "adequate" if it is "firmly established and regularly followed." Id. (quoting Ford v. Georgia, 498 U.S. 411, 424

---

[1]   As noted by the California Court of Appeal, in his trial brief, petitioner's counsel requested that CALCRIM 505 be modified in a number of ways, including adding the language that great bodily injury may be inflicted by hands or fists. (CT at 34.) After the instructions were read to the jury, petitioner's counsel objected to the version of CALCRIM 505 read to the jury because it did not include all of his proposed modifications. (RT at 863-64.) Petitioner's counsel acknowledged that the trial court had given his proposed modification that great bodily injury can be caused by hands or first, but objected that he had wanted CALCRIM 505 modified in all of the ways he proposed. (Id. at 864.)

1  (1991)).  See also Bennett v. Mueller, 322 F 3d 573, 583 (9th Cir. 2003) ("[t]o be deemed

2  adequate, the state law ground for decision must be well-established and consistently applied.")

3  The state rule must also be "independent" in that it is not "interwoven with the federal law."  Park

4  v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S. 1032,

5  1040-41 (1983)).  Even if the state rule is independent and adequate, the claims may be heard if

6  the petitioner can show:  (1) cause for the default and actual prejudice as a result of the alleged

7  violation of federal law; or (2) that failure to consider the claims will result in a fundamental

8  miscarriage of justice.  Coleman, 501 U.S. at 749-50.

9       Respondent has met his burden of adequately pleading an independent and adequate state

10  procedural ground as an affirmative defense.  See Bennett, 322 F.3d at 586.  The invited error

11  doctrine is recognized as a valid procedural default that bars federal habeas review.  See, e.g.,

12  Leavitt v. Arave, 383 F.3d 809, 832 (9th Cir. 2004) (recognizing that invited error doctrine may

13  be a valid basis for procedural default under habeas review where the state court clearly and

14  expressly invoked the invited error doctrine).  Petitioner, who did not file a reply to respondent's

15  answer, has failed to meet his burden of asserting specific factual allegations that demonstrate the

16  inadequacy of California's invited error doctrine as unclear, inconsistently applied or not well-

17  established, either as a general rule or as applied to him.  Bennet, 322 F.3d at 586.  Petitioner has

18  also failed to demonstrate that there was cause for his procedural default or that a miscarriage of

19  justice would result absent review of the claims by this federal habeas court.  See Coleman, 501

20  U.S. at 748.

21       Accordingly, for the reasons discussed above, petitioner's claim alleging jury instruction

22  error is procedurally barred.  Nonetheless, even if this claim were not procedurally barred, for the

23  following reasons it lacks merit and should be denied.

24       C.  Analysis of Merits of Jury Instruction Claim

25       Legal Standard

26       Habeas relief is warranted on the basis of a flawed jury instruction if the flaw amounted to

27  constitutional error and caused prejudice.  Calderon v. Coleman, 525 U.S. 141, 145-47 (1998).  A

28  jury instruction in a criminal trial violates due process, and thus amounts to constitutional error, if

1    it relieves the state of its burden of proving beyond a reasonable doubt each element of the

2    charged offense.  Carella v. California, 491 U.S. 263, 265 (1989).  "[N]ot every ambiguity,

3    inconsistency, or deficiency in a jury instruction" will have such an effect, however.  Middleton

4    v. McNeil, 541 U.S. 433, 437 (2004).  Where it is unclear whether an instruction relieves the state

5    of its burden of proof because a challenged instruction is ambiguous, constitutional error exists

6    only if "'there is a reasonable likelihood that the jury has applied the ... instruction in a way'" that

7    would lead to conviction without proof beyond a reasonable doubt for each element of the

8    charged offense.  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Boyde v. California, 494

9    U.S. 370, 380 (1990)).

10        *Analysis*

11        The California Court of Appeal correctly found, as petitioner through counsel conceded,

12   that CALCRIM 505 correctly stated the law, i.e., that great bodily injury can be inflicted with

13   hands or fists.  Petitioner's real argument appears to be that CALCRIM 505, as modified, led the

14   jury to believe that the trial court regarded the first fight with the victim, i.e, the fist fight, as the

15   sole provocation for petitioner shooting the victim, which reduced the prosecution's burden of

16   negating the defense theory that the victim was reaching for a gun when he was shot.  For the

17   reasons stated herein, the undersigned finds that the denial of this claim by the California Court of

18   Appeal was not an unreasonable application of clearly established Supreme Court authority.

19        To put petitioner's claim in context, the undersigned quotes the relevant portion of

20   CALCRIM 505 read to the jury:

21        505.  Justifiable Homicide:  Self-Defense or Defense of Another

22        The defendants are not guilty of murder or manslaughter if they
     were justified in killing someone in self-defense or defense of
23   another.  A defendant acted in lawful self-defense or defense of
     another if:

24
     1. The defendant reasonably believed that he or someone else was
25   in imminent danger of being killed or suffering great bodily injury.

26        2.  The defendant reasonably believed that the immediate use of
     deadly force was necessary to defend against that danger.
27
     AND
28

23

3.   The defendant used no more force than was reasonably necessary to defend against that danger.

****

Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm, and it may be inflicted by hands or fists.

(CT at 653-54.)

The jury was also instructed with CALJIC 5.31, which read,

CALJIC 5.31 Assault with Fists – When Use of Deadly Weapon Not Justified.

An assault with the fists does not justify the person being assaulted in using a deadly weapon in self-defense or defense of another unless that person believes, and a reasonable person in the same or similar circumstances would believe, that the assault is likely to inflict great bodily injury upon him or upon another person.

(CT at 654.)

As noted by the state appellate court, CALCRIM 505, as modified, benefited petitioner by allowing the jury to find he acted in self-defense, even if the victim and Thomas did not have any weapons other than their fists.  In addition, as read together, CALCRIM 505 and CALJIC 5.31, informed the jury that a reasonable person could not use deadly force to defend against an assault by hands or fists unless that person reasonably believed that the assault was likely to inflict great bodily injury.  These instructions did not lead the jury to believe that the court regarded the first fight between petitioner and the victim as the "sole provocation," or minimize petitioner's defense that the victim was reaching for a gun.

In addition, as noted by the California Court of Appeal, the jury was instructed not to take anything said by the trial judge during the trial as an indication of what he thought about the facts or what the verdict should be.  (CT at 639.)  The jury was also instructed, "Do not assume just because I give a particular instruction that I am suggesting anything about the facts."  (Id. at 642.) These instructions instructed the jury to disregard any statement by the trial judge or jury instruction suggesting the judge's views regarding the facts or verdict.  A jury is presumed to follow its instructions.  Weeks v. Angelone, 528 U.S. 225, 234 (2000).

1    The undersigned also finds that the California Court of Appeal reasonably found that the

2    only evidence supporting petitioner's theory, i.e, that it looked like the victim was reaching for a

3    gun, was petitioner's own testimony.  The lack of evidence supporting petitioner's defense

4    undermines any possible prejudice caused by the at-issue instructions.

5    For the reasons discussed above, the undersigned finds that CALCRIM 505, as modified,

6    did not wrongly lead the jury to believe that the trial court regarded the first fight with the victim,

7    i.e. the first fight, as the sole provocation for petitioner shooting the victim, thus reducing the

8    prosecution's burden of negating the defense theory that the victim was reaching for a gun when

9    he was shot.  Accordingly, this claim is without merit.

10    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

11    habeas corpus be denied.

12    These findings and recommendations are submitted to the United States District Judge

13    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

14    after being served with these findings and recommendations, any party may file written

15    objections with the court and serve a copy on all parties.  Such a document should be captioned

16    "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

17    he shall also address whether a certificate of appealability should issue and, if so, why and as to

18    which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

19    applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

20    2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after

21    service of the objections.  The parties are advised that failure to file objections within the

22    specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

23    F.2d 1153 (9th Cir. 1991).

24    Dated:  June 13, 2016

25

26    _____
      KENDALL J. NEWMAN
27    UNITED STATES MAGISTRATE JUDGE

28    Rod654.157

25